IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


GAIL A. BURDEN

                        Plaintiff,

      v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                        Defendant.

No. 6:14-cv-00499-HZ

OPINION & ORDER


Kathryn Tassinari
Harder, Wells, Baron & Manning, P.C.
474 Willamette, Ste. 200
Eugene, OR 97401

      Attorney for Plaintiff


//
//
//


1 - OPINION & ORDER

Billy J. Williams
Acting United States Attorney, District of Oregon
Ronald K. Silver
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR 97201

Kathy Reif
Special Assistant United States Attorney
Social Security Administration
SSA Office of General Counsel
701 5th Avenue, Suite 2900 M/S 221A
Seattle, WA 98104

      Attorneys for Defendant

HERNÁNDEZ, District Judge:

      Plaintiff Gail Ann Burden brings this action under the Social Security Act ("Act"), 42 U.S.C. §§ 405(g), for judicial review of the Commissioner of Social Security's final decision denying her claim for Disability Insurance Benefits ("DIB") under Title II of the Act, and Supplemental Security Income Benefits ("SSI") under Title XVI of the Act. Because the ALJ did not give legally sufficient reasons for denying Burden's claim, the Commissioner's decision is reversed and remanded for an award of benefits.

## BACKGROUND

      Burden applied for SSI and DIB on March 11, 2010. Tr. 179–91. The Commissioner denied both applications, and Burden requested a hearing before an ALJ. Tr. 134–57. After a hearing in September of 2010, Administrative Law Judge ("ALJ") Mary Kay Rauenzahn found Burden was not disabled. Tr. 12–32. Burden appealed, but the Appeals Council denied her request for review. Tr. 1–7. Burden timely appealed the ALJ's decision to this Court.

## SEQUENTIAL DISABILITY EVALUATION

A claimant is disabled if she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability claims are evaluated according to a five-step procedure. See Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 689 (9th Cir. 2009). Each step is potentially dispositive. At step one, the presiding ALJ determines whether the claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled; if not, the analysis continues. 20 C.F.R. §§ 404.1520(b), 416.920(b). At step two, the ALJ determines whether the claimant has one or more severe impairments. If not, the claimant is not disabled. 20 C.F.R. §§ 404.1520(c), 416.920(c). At step three, the ALJ determines whether the impairment meets or equals one of the impairments listed in the SSA regulations and deemed "so severe as to preclude substantial gainful activity." Bowen v. Yuckert, 482 U.S. 137, 141 (1987); 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if not, the analysis moves to step four. 20 C.F.R. §§ 404.1520(d), 416.920(d). At step four, the ALJ determines whether the claimant, despite any impairments, has the residual functional capacity ("RFC") to perform past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant cannot perform his or her past relevant work, the analysis moves to step five where the ALJ determines whether the claimant is able to do any other work in the national economy considering the claimant's RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(g), 416.920(g).

The burden to show disability rests with the claimant at steps one through four, but if the analysis reaches step five, the burden shifts to the Commissioner to show that a significant number of jobs exist in the national economy that the claimant could perform. 20 C.F.R. §§

404.1520(e) & (f), 416.920(e) & (f); Tackett v. Apfel, 180 F.3d 1094, 1098–1100 (9th Cir. 1999). If the Commissioner demonstrates a significant number of jobs exist in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g)(1), 416.920(g).

## ALJ DECISION

At step one, the ALJ found Burden had not engaged in substantial gainful activity since July 1, 2008. Tr. 17. Although she had worked after that date, the ALJ found that her minimal earnings of approximately $1,600 since that time did not constitute substantial gainful activity. Tr. 18. At step two, the ALJ found she had the "following severe impairments through the entire relevant period: alcohol abuse disorder, major depressive disorder, anxiety disorder, obesity and hives/eczema/dermatitis." Tr. 18. At step three, the ALJ found Burden's "mental impairments, including the substance use disorder, met listing 12.04 and 12.06 and, by reference, listing 12.09 of 20 C.F.R. Part 404, Subpart P, Appendix 1." Tr. 18–19. The ALJ also found that even if Burden stopped the substance abuse, her impairments would remain severe. Tr. 21. However, if Burden were to stop the substance abuse, the ALJ found that her impairments, singly or in combination, would not meet or equal the requirements of any listed impairment. Tr. 21.

Next, the ALJ assessed Burden's RFC assuming no substance abuse and concluded that she could perform medium wok, as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), but with the following additional limitations:

> [S]he can understand, remember, and carry out only simple instructions that can
> be learned in 30 days or less, and can handle low-stress jobs that require only
> occasional changes in a work setting with occasional independent
> decisionmaking. The claimant needs an isolated position, or one that requires
> occasional public contact and no work directly with the public. The claimant can
> sustain occasional contact with coworkers and supervisors. She cannot perform
> group tasks. The claimant must avoid workplace hazards such as unprotected

heights or moving machinery and cannot work around alcohol, medication, or
chemical irritants. She cannot perform jobs requiring paperwork or recordkeeping
as part of the job.

Tr. 22. The ALJ found that this RFC did not allow Burden to perform her past relevant work as a

certified nursing assistant because that was a semi-skilled job. Tr. 24. The ALJ found at step five,

however, Burden could perform work in the national economy as a porter, hand packager, and

electronics worker. Tr. 25. Therefore, the ALJ found Burden was not disabled under the Act.

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if it is based on proper legal

standards and the findings are supported by substantial evidence in the record as a whole. 42

U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial

evidence means more than a mere scintilla but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." Id. The court

must weigh all of the evidence, whether it supports or detracts from the Commissioner's

decision. Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986). If the evidence is susceptible to

more than one reasonable interpretation, the court must uphold the decision. Andrews, 53 F.3d at

1039–40. A reviewing court must consider the entire record as a whole and cannot affirm the

Commissioner by simply isolating a specific quantum of supporting evidence. Robbins v. Soc.

Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006) (citation omitted).

## DISCUSSION

Burden contends the ALJ erroneously assessed 1) her credibility, 2) the opinion of Dr.

Kris Hallenburg, a consulting psychologist, 3) testimony from Patrick Tilcock, an occupational

employment specialist, 4) Burden's alcohol abuse as contributing materially to her disability

prior to August 10, 2010, and 5) Burden's ability to perform "other work" in the national economy at step five.

### 1. Credibility

Burden asserts that the ALJ erroneously evaluated her testimony about the intensity, persistence, and limiting effects of her symptoms. Pl. Brief at 12–14. In determining a claimant's RFC, the ALJ must consider all relevant evidence in the record, including medical records, lay testimony, and the "effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." Robbins, 466 F.3d at 883 (quoting SSR 96–8p, 1996 WL 374184, at *5); see also 20 C.F.R. §§ 404.1529(a), 404.1545(a), 416.929(a), 416.945(a) (explaining that, in determining whether a claimant is disabled, the Social Security Administration considers "all . . . symptoms, including pain, and the extent to which [those] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.").

An ALJ analyzes the credibility of a claimant's testimony regarding her subjective pain and other symptoms in two steps. Lingenfelter v. Astrue, 504 F.3d 1028, 1035–36 (9th Cir. 2007). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." Id. at 1036 (citation and internal quotation omitted). "The claimant, however, need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." Id. (citation and internal quotation omitted). If the claimant meets the first test, and there is no evidence of malingering, the ALJ can reject her testimony about the

severity of her symptoms only by offering specific, clear and convincing reasons for doing so. Id. (citation and internal quotation omitted).

The ALJ's credibility findings must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." Orteza v. Shalala, 50 F.3d 748, 750 (9th Cir. 1995) (citing Bunnell v. Sullivan, 947 F.2d 341, 345–46 (9th Cir. 1991) (en banc )). The ALJ may consider objective medical evidence and the claimant's treatment history, as well as the claimant's daily activities, work record, and observations of physicians and third parties with personal knowledge of the claimant's functional limitations. Smolen v. Chater, 80 F.3d 1273, 1283 (9th Cir. 1996). The ALJ may additionally employ ordinary techniques of credibility evaluation, such as weighing inconsistent statements regarding symptoms by the claimant. Id. The ALJ may not, however, make a negative credibility finding "solely because" the claimant's symptom testimony "is not substantiated affirmatively by objective medical evidence." Robbins, 466 F.3d at 883; see also Bunnell, 947 F.2d at 346–47.

There is no evidence of malingering in the record. Therefore, the ALJ's reasons for discounting Burden's credibility must be clear and convincing. The ALJ supported her conclusion that Burden was less than credible by pointing to medical evidence in the record showing improvement in Burden's symptoms, apparently conflicting testimony between Burden and lay witness Patrick Tilcock, and evidence showing that Burden was avoiding job opportunities outside of her preferred work as a care giver.

### i. Medical Evidence Showing Improvement

The ALJ discounted Burden's claims about the limiting effects of her symptoms because they "far exceed[ed] that supported by the record." Tr. 23. The ALJ pointed to Burden's GAF score of 47 in October 2010, reports in September and October of 2011 that her mood was

"bright" and she was euthymic and nicely groomed, and notes in March, April, July, and August of 2012 that showed her functioning was "excellent" and that she was not exhibiting signs of anxiety. Tr. 23.

But these selected reports are not a "clear and convincing" reason for discounting Burden's testimony. A full reading of Burden's treatment records in context show that the severity of her symptoms vacillated widely—for example, she showed no signs depression and "excellent" functioning in late April, 2012, Tr. 771, but was "really struggl[ing] with . . . ongoing anxiety" in the middle of May, 2012. Tr. 763. On July 30, 2012, a provider reported that there was "[n]o impairment due to anxiety or disorganized thinking," but on September 6, 2012, another provider reported that Burden was "having difficulties," and she appeared "labile," "anxious," and "tangential." Tr. 719. A few weeks later, she was "markedly distressed and anxious," Tr. 801, and was ""erratic," "disheveled," and "agitated." Tr. 806. Such "[c]ycles of improvement and debilitating symptoms are a common occurrence" in treating mental health issues, and thus "it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." Garrison v. Colvin, 759 F.3d 995, 1017 (9th Cir. 2014).

Moreover, any reports of "improvement" in Burden's symptoms must be understood in context: during this time Burden was staying in a recovery house, and receiving a "very high level of service" from the "assertive community treatment" team at the Laurel Hill Center. Tr. 681–89, 826. That her anxiety improved while attending multiple therapy sessions per week does not conflict with her claims that she would have debilitating anxiety in the workplace. Garrison, 759 F.3d at 1017 (explaining that reports of improvement "must also be interpreted with an

awareness that improved functioning while being treated and while limiting environmental stressors does not always mean that a claimant can function effectively in a workplace.").

Finally, the ALJ did not explain the significance of Burden's GAF score of 47 in October of 2010, or how the score undermined her credibility. Tr. 23. GAF scores are used by clinicians to rate an individual's overall level of functioning and can encompass psychological, social, and occupational abilities. Wright v. Comm'r of Soc. Sec., No. 1:13-CV-02193-ST, 2015 WL 462016, at *8 (D. Or. Feb. 4, 2015). Although the Social Security Administration has not adopted the GAF scale as directly correlative of an individual's ability to work, a GAF score provides a "rough estimate of an individual's psychological, social, and occupational functioning[.]" Hall v. Astrue, No. CV 10-512-SI, 2011 WL 4381734, at *16 (D. Or. Sept. 19, 2011) (quoting Keyser v. Comm'r, 648 F.3d 721, n.1 (9th Cir. 2011) (Graber, J., dissenting)). [1] A GAF score of 47 indicates "serious impairment in social occupation or school functioning (e.g., no friends, unable to keep a job)." Diagnostic and Statistical Manual of Mental Disorders IV (DSM–IV-TR) 34 (4th ed. 2000)). The ALJ does not explain how Burden's score conflicts with her testimony that she cannot work because of her anxiety, inability to focus, and trouble following even simple directions, and therefore it is not a clear and convincing reason for discrediting her claims.

The ALJ found that Burden's testimony "that she is nervous and anxious around people she does not know, and that anxiety keeps her from being able to work" conflicted with other

---

[1] The fifth edition of the DSM abandoned the GAF scale in favor of standardized assessments for symptom severity, diagnostic severity, and disability. See Diagnostic and Statistical Manual of Mental Disorders V (DSM–V) 16 (5th ed.2013)). However, at the time of Burden's assessment and the ALJ's opinion, the GAF scale was used to report a clinician's judgment of the patient's overall level of functioning.

testimony that contacting employers was one of Burden's strengths. Tr. 23. But a close reading of the testimony reveals no actual conflict.

Burden testified that she has "really high anxiety," which made it difficult for her to concentrate. Tr. 40. It was her anxiety and lack of focus that led to her getting fired from a housekeeping position at the Holiday Inn in 2012 after only a few days: "I couldn't focus on making the beds very well, I had anxiety, I wasn't getting the rooms done fast enough." Tr. 38. Burden explained that her anxiety is particularly high in group settings. Tr. 41. When the ALJ asked her if she did better by herself or with one or two other people, Burden explained that she was slightly more comfortable "for a little while," but then had to leave the situation and "go home." Tr. 41.

Mr. Patrick Tilcock is an employment specialist who works with individuals like Burden with psychiatric disabilities. Tr. 50. At the time of the hearing, he had been assisting Burden for more than a year by helping her make employer contacts, submit applications, and prepare for interviews. Tr. 50. Tillcock testified that Burden is "subject to anxiety real easily," which can "make her lose focus." Tr. 53. He explained that these problems likely caused her to be fired from the Holiday Inn. Tr. 53. He also testified that Burden "has thrown herself wholeheartedly into the whole process of . . . looking for work, and applying for jobs, and putting . . . her best effort out there to try and find something." Tr. 57.

The ALJ focuses on Mr. Tilcock's testimony that Burden "is very outgoing and is not shy about talking to people." Tr. 54. Tillcock said that he believed "contacting employers . . . is certainly a strength of hers," and that Burden had "some strengths in terms of her . . . personal engagement skills." Tr. 54. But he explained that those skills would only "allow her to work a few hours a week" and that he "strongly doubt[ed]" she could sustain full-time work. Tr. 54–55.

The ALJ essentially manufactured a conflict between Mr. Tilcock's testimony and Burden's claims by ignoring other parts of Mr. Tilcock's testimony in which he explains that even Burden's biggest strengths, her personal engagement skills and passion for caring for others, would not enable her to work more than "a few hours a week." Tr. 54–55. Moreover, the ALJ overlooked Mr. Tilcock's testimony in which he describes Burden as significantly impaired by anxiety, confusion, and inability to focus on the job. Tr. 53–54. Additionally, Mr. Tilcock's testimony that Burden was "outgoing" or capable of contacting employers is not inconsistent with Burden's testimony that she is slightly more comfortable with one or two other people for a short time before becoming overcome with anxiety. Tr. 41.

Tillcock's testimony that Burden has "difficulty with tasks requiring attention and focus," and a "limited . . . tolerance for input and for stress" is also consistent with Burden's testimony that her anxiety caused her to lose focus and forget things, and that she was unable to follow even simple instructions on the job. Tr. 38, 43– 44. Accordingly, the ALJ's conclusion that Mr. Tilcock's testimony is inconsistent with Burden's claims is not supported by the record, and thus cannot be a legitimate reason for discounting Burden's testimony.

The ALJ also discredited Burden's claimed inability to work because "[i]t is clear that [Burden] only wants to work as a caregiver, and the record shows that she did not follow up on several jobs referred to her by Mr. Tilcock that were not caregiving." Tr. 23. But the record does not support that conclusion. The ALJ seems to be relying on an exchange with Mr. Tilcock about Burden's job search:

> ALJ: Now you indicated that she wants a job as – in, in care giving.
>
> A: Yes.
>
> ALJ: You've, have you identified other jobs for her that are not within care giving that she's not followed up on?

A: She's not followed up on? She has been really good about following up on any, any leads that I have – we've, we've uncovered together and she's found some on her own. She's, and she's been really active as a job seeker.

ALJ: Ok. It looks like from the records that, that you've offered her some assistance with contacting employers and putting in applications that at times she's resisted because she wanted to do it on her own. So would that be a correct assessment?

A: Because she's resisted –

ALJ: Well she doesn't want – she doesn't necessarily want you going along with her.

A: No, no – yeah, yeah, right, right, exactly, exactly. She's – so to date she has preferred to do it on her own . . . .

Tr. 57–58. The other relevant testimony is an earlier exchange between Burden and the ALJ:

ALJ: All right. You have been looking for work however have you not?

A: With – when Patrick takes me.

ALJ: Okay. Well that's not what your records say. Your records say that you actually asked that nobody go with you on some of your interviews, that you wanted to go by yourself.

A: Well no, Patrick takes me.

ALJ: Okay. But he doesn't go actually into the interview with you?

A: Yeah.

ALJ: Okay. So you have been going out on interviews –

A: Yeah, but –

ALJ: And looking for work?

A: – It hasn't, it hasn't been – I mean I haven't done an interview for a while. I mean he wants to go in with me when I pick up an application and I think that kind of looks weird. Like if I'm bringing my dad with me to get an application.

Tr. 38–39.

ALJ: Has Laurel Hill been discussing with you working full-time, working part-time or kind of both to see what would happen or what?

A: They don't really discussed [sic] anything. I mean Patrick just gets on Craigslist, he'll give me the jobs to go to – do I go to them, no. But sometimes when he has them I'll go with him to get an application but I get the application I fill it out. So they don't really say anything about part-time or full-time.

ALJ: Why don't you go to them if he gives you the –

A: Because I don't like going on the bus, I get scared going by myself.

Tr. 48.

The ALJ's conclusion that it is "clear" that Burden "only wants to work as a caregiver" is simply not borne out by this testimony or other evidence in the record. Burden sought out and secured the housekeeping job at the Holiday Inn on her own without any assistance from Mr. Tilcock, and the record indicates that she applied to several restaurant jobs. Tr. 51, 67, 709 . Mr. Tilcock's testimony contradicted the ALJ's questioning about whether Burden did not follow up on jobs outside of caregiving, and he testified that Burden is a "really active job seeker" and that she has "thrown herself wholeheartedly" into her job search. Tr. 57.

Finally, the ALJ discounted Burden's testimony that "another reason she cannot work is her need for naps, due presumably to medication side effects." Tr. 23. The ALJ explained that Burden was on the same medication while at the state hospital but did not nap "because she had to be at class and did not have the opportunity. Nothing prevents [Burden] from doing the same thing now if motivated to do so." Tr. 23. But Burden testified that she believed she was on a different medication at the time of the hearing that she was at the state hospital, and her medication list from the hospital does not match her listed medications from records at the Laurel Hill Center. Tr. 59. 489, 753. Accordingly, this erroneous reading of the record cannot form a legitimate basis for rejecting Burden's claimed limitations.

In sum, the ALJ's given reasons for discounting Burden's credibility are not supported by substantial evidence in the record, and thus they are not "clear and convincing" reasons for discrediting her testimony.

### 2. Dr. Hallenburg's Opinion

Next, Burden contends that the ALJ improperly gave "little weight" to the opinion of consultive examiner Kris Hallenburg, Ph. D. Tr. 24. There are three sources of medical opinion evidence in Social Security cases: treating physicians, examining physicians, and non-examining physicians. Valentine, 574 F.3d at 692 (citing Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995)). The ALJ can reject the uncontroverted opinion of a treating or examining physician only for "clear and convincing reasons" supported with substantial evidence in the record. Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007) (quoting Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998)). Even if a treating or examining doctor's opinion is contradicted by another doctor, the ALJ can reject it only by providing "specific and legitimate reasons" that are supported by substantial evidence. Id.

Dr. Hallenburg's report from January, 2011, explained that Burden had "a number of conditions impairing her function." Tr. 635. She noted that Burden was placed in special education classes by the ninth grade, and diagnosed a GAF score in the 30-35 range. Tr. 635. The mental exam showed "some deficits in memory and processing, as did [Burden's] presentation." Tr. 635. Dr. Hallenburg stated that Burden "would have difficulty managing herself and maintaining sobriety while living independently." Tr. 635. Even though Burden's condition had stabilized on new medication, Dr. Hallenburg opined that Burden "remain[ed] significantly mentally impaired." Tr. 635. Finally, Dr. Hallenburg wrote that Burden "would have difficulty maintaining employment partly because her presentation would be taken as

outside the normal range and she would most likely have difficulty comprehending and keeping up with the job." Tr. 635.

The ALJ gave Dr. Hallenburg's report "little weight." The doctor's narrative report, the ALJ reasoned, showed that Burden "was independent and had good concentration." Tr. 24. Dr. Hallenberg did "not present relevant evidence to support such an extremely low GAF score" or her opinion about Burden's "inability to keep a job." Tr. 24. Finally, the ALJ explained that Dr. Hallenburg's opinion is "inconsistent with other evidence in the record." Tr. 24.

None of those reasons stands up to legal scrutiny. First, the ALJ did not cite to any evidence that contradicts Dr. Hallenberg's opinion. Therefore, the ALJ was required to give "clear and convincing" reasons for discounting Dr. Hallenberg's report.

Second, the ALJ focused narrowly on the portions of Dr. Hallenburg's report that suggested Burden was not seriously impaired, and ignored the majority of the report that showed otherwise. The ALJ did not explain Dr. Hallenburg's findings that Burden's eye contact was "often a fixed stare," that she "rocked back and forth throughout the entire interview," that her speech as "somewhat slow" and "slightly loud and monotone," that there "appeared to be delay in processing in giving her answers," or that she was "[p]ositive for visual hallucinations." Tr. 633. While it is true that Burden's concentration and persistence on the exam was good, the ALJ failed to mention that she could only recall three of four objects after a five minute delay, guessed that there were thirteen weeks in a year, could not identify the states that border Oregon, and could not add 8 + 8 accurately without counting it out on her fingers. Tr. 634. She also misspelled "house" as "huose" and "had to spend quite a lot of time to think about" it. Tr. 634. This "selective focus" on the portions of Dr. Hallenburg's report which tend to suggest non-disability is not a legally sufficient reason for discounting her opinion that Burden was

"significantly mentally impaired" and unable to sustain full-time work. Edlund v. Massanari, 253 F.3d 1152, 1159 (9th Cir. 2001), as amended on reh'g (Aug. 9, 2001).

Third, the ALJ does not explain her conclusion that Dr. Hallenburg's narrative revealed that Burden was "independent." Tr. 24. Burden's activities of daily living shows that she lived in a "recovery house," did her assigned chores in the house, made coffee, watched TV, and took care of her personal hygiene. Tr. 633. These limited daily activities do not conflict with Dr. Hallenburg's opinion that Burden is significantly mentally impaired and not able to maintain competitive employment. See Gunther v. Com'r Soc. Sec. Admin., 804 F. Supp. 2d 1079, 1087 (D. Or. 2011) (explaining that "[a]ctivities that include taking care of oneself, hobbies, therapy and household tasks are not considered substantial gainful activity that disqualifies a claimant from receiving disability benefits.") (citation omitted).

In sum, none of the reasons analyzed above nor the ALJ's generic reference to inconsistencies with "other evidence in the record" is a legally sufficient reason to reject Dr. Hallenberg's report.

### 3. Materiality of Alcohol Abuse

Burden contends that the ALJ erred in concluding that between her alleged onset date of July 2008 and August of 2010 that she had listing-level mental impairments but that her alcohol abuse was a material factor contributing to her disability. Tr. 18–19. If an ALJ finds a claimant is disabled, but drug addiction or alcoholism is a contributing facts material to the disabling condition, then the claimant is disqualified from receiving benefits. 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J). An "ALJ must conduct a drug abuse and alcoholism analysis . . . by determining which of the claimant's disabling limitations would remain if the claimant stopped using drugs or alcohol." Parra v. Astrue, 481 F.3d 742, 747 (9th Cir. 2007) (citing 20 C.F.R. § 404.1535(b)).

"If the remaining limitations would still be disabling, then the claimant's drug addiction or alcoholism is not a contributing factor material to his disability. If the remaining limitations would not be disabling, then the claimant's substance abuse is material and benefits must be denied." Id. (citing 20 C.F.R. § 404.1535(b)).

At step three, the ALJ concluded that Burden's mental impairments met the requirements of listings 12.04 (affective disorders), 12.06 (anxiety-related disorders), 12.09 (substance abuse disorders) from July 1, 2008 through August 11, 2010. Tr. 18–19. The ALJ found that during this period, Burden had marked difficulties in social functioning, and with concentration, persistence and pace, and moderate restrictions in her activities of daily living. Tr. 19. The ALJ also found that Burden suffered three episodes of decompensation attributable to substance abuse. Tr. 19. In particular, the ALJ noted that Burden was admitted to inpatient care multiple times for suicide attempts, all of which were alcohol and drug related. Tr. 19–20.

The ALJ then analyzed Burden's abilities if she stopped using alcohol. Tr. 21. Her impairments, the ALJ found, would still have been severe, but none of them met the listing requirements. Tr. 21. Excluding the effects of alcohol, the ALJ found that Burden had only moderate restrictions in daily activities, social functions, and concentration, persistence, and pace, and that she suffered no episodes of decompensation without alcohol abuse. Tr. 21. The ALJ concluded that, without the effects of alcohol abuse, Burden's claimed limitations "far exceed[ed]" those supported by the record. Tr. 23. The ALJ primarily relied on the reported improvement in Burden's symptoms since beginning treatment at the Laurel Hill Center, the apparent conflict between testimony from Burden and Mr. Tilcock, and Burden's "clear" desire to work as a care-giver. As explained above, none of those reasons stand up to legal scrutiny.

Particularly, Burden's "improvement" while undergoing intensive therapy does not indicate that she is able to sustain competitive employment. Garrison, 759 F.3d at 1017–18; Holohan v. Massanari, 246 F.3d 1195, 1205 (9th Cir. 2001) ("[The treating physician's] statements must be read in context of the overall diagnostic picture he draws. That a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace."). In Burden's case, this stark difference between "improvement" in therapy and inability to work is readily demonstrated by her short stint as a housekeeper at the Holiday Inn. Burden started that job in January of 2012, approximately eighteen months into her sobriety and during a time which the ALJ asserts Burden could perform work with certain limitations. Tr. 25, 198. A treatment report from January 31, 2012 stated that Burden was "nicely groomed and dressed," her mood was euthymic, her thinking "clear, goal directed and reality based." Tr. 712. She was "doing fine living alone," though she was "slightly anxious." Tr. 712. Two days later, she was 'full of energy and friendly," and she "led the group again today and did a great job of it. This is part of her recovery plan and it's appearing to be a great help." Tr. 710. The provider also noted "[p]rogress made in decreasing symptoms of anxiety and depression . . . ." Tr. 710.

Despite those positive treatment reports, Burden clearly could not handle the job at the Holiday Inn. She lasted all of one week before the hotel fired her because she could not follow simple instructions such as how many cups to leave in a room after cleaning and where to place them, or how to make the bed properly. Tr. 38. Burden's firing after only a few days demonstrates her significant difficulties in performing at work despite making strides in therapy.

The ALJ's conclusion that Burden can work is further belied by Dr. Hallenburg's opinion that Burden is "significantly mentally impaired," and  "would have difficulty maintaining

employment party because her presentation would be taken as outside the normal range and she would most likely have difficulty comprehending and keeping up with the job." Tr. 635. As explained above, the ALJ failed to give legally sufficient reasons for rejecting Dr. Hallenburg's opinion, an error compounded by the fact that Dr. Hallenburg's opinion is the only medical evidence which directly addresses Burden's ability to maintain employment after August of 2010. See Garrison, 759 F.3d at 1017–18 (cautioning against interpreting improved functioning in mental health patients as indicative of an ability to work "especially . . . when no doctor or other medical expert has opined, on the basis of a full review of all relevant records, that a mental health patient is capable of working or is prepared to return to work.").

While Burden was clearly seriously impaired by the combination of alcohol abuse and her mental conditions prior to 2010, her continued struggles with anxiety, confusion, and mental impairment after an extended period of sobriety show that alcohol abuse was not material to her disability, and the ALJ's conclusion to the contrary was legal error.

The Court does not reach Burden's other grounds for challenging the ALJ's decision.

**4. Remand**

Having established that the ALJ committed legal error, the remaining question is whether to remand this matter for an award of benefits or for further proceedings. Garrison, 759 F.3d at 1019 (explaining that if "additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded," but "in appropriate circumstances courts are free to reverse and remand a determination by the Commissioner with instructions to calculate and award benefits") (internal quotation marks omitted).

The Ninth Circuit applies a three-part test to determine which type of remand is appropriate. Id. at 1020. First, the ALJ must fail to provide legally sufficient reasons for rejecting

evidence. Second, the record must be fully developed and further administrative proceedings would serve no useful purpose. Third, if the case is remanded and the improperly discredited evidence is credited as true, the ALJ would be required to find the claimant disabled. Each part must be satisfied to remand an award for benefits. Id.

Here, the ALJ failed to provide legally sufficient reasons for rejecting Burden's testimony, Dr. Hallenburg's opinion, and for concluding that alcohol was material to her disability prior to August of 2010. Dr. Hallenburg's properly credited opinion is that Burden is "significantly mentally impaired," her learning of both "detailed and simple tasks is impaired," and she would be unable to sustain competitive employment because she "would mostly likely have difficulty comprehending and keeping up with the job." Tr. 635. Burden's testimony is that her anxiety causes her to lose concentration and focus, causes her significant confusion, and that she is unable to follow even simple directions. Tr. 38, 41, 43–44. The VE testified that a person with Burden's limitations who would be "off task" for at least ten percent of the time on the job would be unable to sustain competitive employment. Tr. 61–62. Therefore, the record is fully developed, and if the case were remanded and the improperly rejected or discounted evidence is credited as true, the ALJ would be required to find Burden disabled under the Act.

## CONCLUSION

The Commissioner's decision is REVERSED and REMANDED for a determination of benefits.

IT IS SO ORDERED.

Dated this ____12____ day of _August_, 2015.

_Marco Hernández_
MARCO A. HERNÁNDEZ
United States District Judge